NORMAN PELLETIER ET AL. *v.* SORDONI/SKANSKA
CONSTRUCTION COMPANY
(SC 17775)

Rogers, C. J., and Norcott, Zarella, Sullivan and Corradino, Js.

Argued October 16, 2007—officially released April 22, 2008

*Daniel J. Krisch*, with whom were *Kimberly A. Knox* and, on the brief, *Jeffrey L. Ment, Joseph B. Burns* and *Sumy Rhee*, legal intern, for the appellant-appellee (defendant).

*William H. Clendenen, Jr.*, with whom were *Kevin C. Shea, Nancy L. Walker* and, on the brief, *Kathryn A. O'Brien* and *Frank B. Velardi*, for the appellees-appellants (plaintiffs).

*Raymond A. Garcia, Jane I. Milas* and *Antonino M. Leone* filed a brief for the Connecticut Building Congress as amicus curiae.

*Anthony J. Natale* and *Richard F. Wareing* filed a brief for the Construction Management Association of America, Southern New England Chapter, et al., as amici curiae.

*Robert F. Carter* filed a brief for the Connecticut Council on Occupational Safety and Health as amicus curiae.

*David N. Rosen* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Opinion*

ZARELLA, J. This appeal arises out of the remand order in *Pelletier* v. *Sordoni/Skanska Construction Co.*, 264 Conn. 509, 527, 825 A.2d 72 (2003), in which we

held that an injured employee of an independent sub-contractor may bring an action in negligence against the general contractor if the employee can establish a legal and factual basis for the general contractor's liability. Upon remand, the negligence claims brought by the injured named plaintiff, Norman Pelletier, and his wife, the plaintiff Reine Pelletier,[1] against the defendant, Sordoni/Skanska Construction Company (Sordoni), were tried to a jury, which returned a verdict for the plaintiff. After granting the plaintiff's motion for post-judgment interest and attorney's fees pursuant to General Statutes § 52-192a,[2] the trial court rendered judgment for the plaintiff in the amount of $41,417,065.15. On appeal,[3] Sordoni claims that the trial court improperly: (1) concluded that, as general contractor for the project, Sordoni owed the plaintiff a nondelegable duty of care under § 1307 of the Building Officials and Code Administrators International, Inc., (BOCA) National Building Code[4] to inspect all steel welds at the construction site; (2) concluded that a violation of the building code constitutes negligence

[1] Because the claim of Reine Pelletier for loss of consortium is derivative of the claims of Norman Pelletier, we refer to Norman Pelletier as the plaintiff throughout this opinion.

[2] General Statutes § 52-192a provides in relevant part: "(c) After trial the court shall examine the record to determine whether the plaintiff made an offer of compromise which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain specified in the plaintiff's offer of compromise, the court shall add to the amount so recovered eight per cent annual interest on said amount. . . . The court may award reasonable attorney's fees in an amount not to exceed three hundred fifty dollars, and shall render judgment accordingly. . . ."

[3] Sordoni appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal and the plaintiff's cross appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] Section 29-252-1a of the Regulations of Connecticut State Agencies adopted the BOCA National Building Code of 1987, as supplemented in 1988, which incorporated § 6 of D1.1 of the standards of the American Welding Society, Inc., (AWS) Structural Welding Code—Steel, hereinafter referred to individually as the building code and the welding code.

per se, rather than "some evidence" of negligence; and (3) declined to admit evidence of, and charge the jury on, the doctrine of excusable negligence. In his cross appeal, the plaintiff claims that, although he prevailed at trial, the court improperly precluded the jury from finding Sordoni liable on any ground other than statutory negligence when the court declined his request to charge the jury on Sordoni's duty to use due care under: (1) principles of common-law negligence; (2) the rule that a general contractor must ensure that its independent subcontractors take special precautions when the work involves a peculiar and unreasonable risk of physical harm; and (3) the rule that a general contractor who retains control over all or a portion of the work performed by its independent subcontractors must ensure that the work is properly performed. We reverse the judgment of the trial court.

The following undisputed facts are set forth in *Pelletier* v. *Sordoni/Skanska Construction Co.*, supra, 264 Conn. 512–14. "At the time of the incident giving rise to this action, Sordoni was the general contractor for the 'Pitney Bowes project,' a building under construction for a large shipping company, Pitney Bowes, Inc. (Pitney Bowes). The plaintiff was an employee of Berlin Steel Construction Company (Berlin Steel), the structural steel fabrication and erection subcontractor for the project. Sordoni hired [Professional Services Industries, Inc., (Professional Services)] to inspect the work performed by Berlin Steel.

"Under its subcontract with Sordoni, Berlin Steel had the responsibility to provide all of the structural steel for the Pitney Bowes project, and to ensure its integrity. This included the duty to weld connections in the structural steel that would allow for the interconnection of steel members as a load-bearing, structural frame for the building. Furthermore, Berlin Steel had the duty to inspect those welds, ensuring their ability to bear

weight. Under its contract with Berlin Steel, Sordoni reserved the right to inspect the structural steel, 'solely for [its own] benefit.' The contractual documents emphasized that Sordoni's '[i]nspection and acceptance, or failure to inspect, shall in no way relieve [Berlin Steel] from [its] responsibility to furnish satisfactory material strictly in compliance with the [c]ontract [d]ocuments.'

"On June 20, 1994, the plaintiff suffered serious physical injuries in an accident at the Pitney Bowes construction site. At the time of the accident, he was working beneath the building's large steel frame, which his employer, Berlin Steel, had been hired to build. The plaintiff was in the process of installing [sheet metal] flooring between two steel columns when several of his coworkers interrupted his work to install a two ton crossbeam between the columns. The plaintiff stepped away while his coworkers bolted the crossbeam to seat connections, which are steel flanges that enable the interconnection of large structural members, located on each of the columns. One of the seat connections, on column 313, had been only tack welded to the column. A tack weld is a weak, provisional weld, which is intended only to hold a piece in place pending a full, load-bearing weld. The tack weld on column 313 did not immediately give way under the load of the crossbeam. After his coworkers secured the crossbeam to the seat connections on the columns, the plaintiff returned to work beneath the crossbeam. Within minutes, the seat connection broke and the corresponding end of the crossbeam fell, striking him. The plaintiff suffered severe injuries and is currently recovering workers' compensation benefits from Berlin Steel for his injuries."

On August 22, 1995, the plaintiff commenced the present action. "In his complaint,[5] the plaintiff alleged negli-

---

[5] The operative complaint for purposes of this appeal is the plaintiff's third amended complaint dated September 18, 2000.

gence as to both Sordoni[6] and Professional Services,

[6] The negligence count against Sordoni included allegations that Sordoni or its agents, servants or employees:

"a. knew or in the exercise of reasonable care and proper inspection should have known about the dangerous and defective condition and should have taken measures and remedies to correct the same, but negligently and carelessly failed to do so;

"b. knew or in the exercise of reasonable care and inspection should have known of the dangerous and defective condition, but failed to warn the plaintiff . . . of the same;

"c. failed to keep said construction site in a condition reasonably safe for persons to work upon, although by a proper and reasonable exercise of care it/they could and should have done so;

"d. allowed said dangerous and defective condition to exist for an unreasonable period of time and took inadequate measures, if any at all, to correct and remedy the same;

"e. failed to perform a pre-erection inspection of the fabricated steel prior to the installation of said steel;

"f. failed to perform an inspection and/or a timely inspection of the steel erected on said site;

"g. failed to implement a program of quality assurance to verify that all welding on the Pitney Bowes Project was being performed in a workmanlike fashion;

"h. failed to coordinate and monitor the field and/or shop inspections of the steel fabrication and erection process;

"i. failed to direct and mandate that a sufficient number of field and/or shop inspections of the steel welding and fabrication process be conducted;

"j. failed to mandate, perform and/or undertake special inspection of the fabricated steel on the premises of the steel erection and fabrication subcontractor although the [s]tatement of [s]pecial Inspections . . . indicated that such inspections were to be performed and were in fact performed;

"k. failed to perform, require or undertake inspections of all main stress carrying elements, welding material and bolting material in violation of [the building code];

"l. failed to conduct inspections of all steel welds in conformance with [the welding code] . . . ;

"m. failed to direct, perform and/or undertake an inspection of the steel frame of the column upon which the seat angle connection collapsed in violation of [the building code] . . . ;

"s. failed to or failed to cause the fabricator to comply with the requirements of the [American Institute of Steel Construction, Inc.] AISC [s]teel [c]onstruction [m]anual requirements for welded construction and quality control requirements for inspection at the fabricator's facility in accordance with the requirements listed as [c]ooperation;

"t. failed to or failed to cause the fabricator to comply with the requirements of the AISC [s]teel [c]onstruction [m]anual requirements for welded

and breach of contract as to Sordoni alone.[7] Both defendants moved for summary judgment. Sordoni argued that, pursuant to the rule set forth by the Appellate Court in *Ray* v. *Schneider*, 16 Conn. App. 660, 548 A.2d 461, cert. denied, 209 Conn. 822, 551 A.2d 756 (1988), it could not be held liable in negligence to the employee of its independent subcontractor. Sordoni also argued that the contract that was alleged in count two of the complaint did not exist. Professional Services argued that it did not owe a duty to the plaintiff under its subcontract with Sordoni. The trial court granted both motions for summary judgment and rendered judgment for the defendants accordingly." Id., 512. The plaintiffs appealed from the trial court's judgment to this court. On July 1, 2003, we reversed the judgment on the negligence claim against Sordoni and remanded the case for further proceedings, but affirmed the judgment in all other respects. Id., 538.

On remand, Sordoni again moved for summary judgment on the plaintiff's claims of negligence and loss of consortium. Sordoni argued that the undisputed facts established that the claims did not fall within any of the exceptions recognized in *Pelletier* v. *Sordoni/Skanska Construction Co.*, supra, 264 Conn. 518, to the rule that a general contractor may not be held liable for the torts of its independent subcontractor.[8] The trial court

construction and quality control requirements listed as [i]nspection of [w]elding;

"u. failed to or failed to cause the fabricator to comply with the requirements of the AISC [s]teel [c]onstruction [m]anual requirements listed as [i]dentification of [s]teel . . . ."

[7] The plaintiff initially brought his action against only Sordoni, but subsequently the trial court granted his motion to cite in Professional Services as a defendant. *Pelletier* v. *Sordoni/Skanska Construction Co.*, supra, 264 Conn. 518 n.7. The plaintiff's complaint also alleged loss of consortium against both defendants.

[8] Sordoni specifically argued that none of the recognized exceptions to the rule that a general contractor cannot be held liable for the negligence of its independent subcontractor applied to the facts of this case. For example, Sordoni had not reserved control over the manner in which Berlin Steel

granted summary judgment for Sordoni[9] and the plaintiff moved to reargue and reconsider. The plaintiff claimed, in part, that the trial court had not examined all of the relevant factors in determining whether Sordoni owed him a duty. These included interpretation of Berlin Steel's subcontract in light of Sordoni's other contractual and statutory duties, the duties Sordoni expressly had assumed for safety at the job site and the requirements of the Connecticut building code. On December 16, 2004, the court vacated its prior decision and denied Sordoni's motion for summary judgment.

The court explained that it previously had neglected to consider Sordoni's regulatory obligations under the building code; Regs., Conn. State Agencies § 29-252-1a; to inspect the welds fabricated by Berlin Steel because the plaintiff had failed to raise the issue in its opposition to the motion.[10] The court nevertheless determined, fol-

---

carried out the work it was hired to perform, namely, fabrication and inspection of the defective weld, or over the steel beam that caused the plaintiff's injuries. The plaintiff responded that issues of material fact existed with respect to Sordoni's: (1) control over the work of Berlin Steel; (2) legal duty under the building and welding codes to ensure compliance by Berlin Steel with certain inspection mandates; (3) hiring of an independent subcontractor that employed uncertified welders; (4) failure to exercise reasonable care; and (5) liability for direct negligence.

[9] The trial court reasoned that: (1) Sordoni was not negligent in employing an incompetent subcontractor, Berlin Steel; (2) Sordoni did not have a legal duty to the plaintiff under its contract with Pitney Bowes, its subcontract with Berlin Steel, or General Statutes §§ 29-276b (c) and 29-276c (b) to inspect Berlin Steel's work to ensure compliance with approved plans and specifications; (3) there was no evidence that Sordoni maintained sufficient control over Berlin Steel and the manner in which it performed its work to establish Sordoni's liability for negligence on that ground; and (4) Sordoni was not directly negligent in causing the plaintiff's injuries because it had no common-law duty to inspect the welds fabricated by Berlin Steel and could not have foreseen the need to inspect all welds to prevent a steel column from giving way and injuring the plaintiff.

[10] We note, however, that the plaintiff raised the issue in his third amended complaint as well as in his opposition to the summary judgment motion, in which he argued that, "by contract with the owner . . . [Sordoni] agreed to perform required special inspections of the fabrication and welding of the structural steel member, in accordance with [s]ection 6 of [t]he [s]tandards of

lowing reconsideration,[11] that the building code imposed a separate and distinct obligation on Sordoni, as the permit applicant, to conduct special inspections of all steel welds to ensure that they conformed to contract and building code specifications. The court explained: "The problem with Sordoni's claim [that it had no legal duty to inspect the welds] is that it sweeps away the obligation imposed on the permit applicant by various sections of the BOCA . . . [code] to provide for special inspections." The court thus concluded, in light of evidence submitted by the plaintiff that Sordoni was the permit applicant and had failed to ensure that all welds were inspected, that the motion for summary judgment had been improvidently granted.

On January 7, 2005, the plaintiff filed a motion for summary judgment as to Sordoni's liability on the remaining negligence claims,[12] arguing that the court had determined that there was no issue of material fact regarding Sordoni's failure to provide special inspections of all steel welds under the building code. The court denied the motion on May 5, 2005, concluding that, although Sordoni had a legal duty to inspect the welds and the undisputed facts supported the plaintiff's claim of a violation under the code, the fact finder still

the American Welding [Society], D1.1 and [s]ections 1307 et. seq. of BOCA. Thus, under the state building code . . . [Sordoni] had a legal duty to ensure compliance by Berlin Steel with certain inspection mandates of the structural steel members."

[11] The court gave the following reasons for reconsidering Sordoni's motion: (1) Sordoni had not objected to reargument on the ground that the issue had not been raised previously by the plaintiff; (2) the issue did not come as a surprise to Sordoni because the plaintiff had raised it in count one of his third amended complaint; (3) this court had noted in *Pelletier* v. *Sordoni/ Skanska Construction Co.*, supra, 264 Conn. 517 n.5, that the issue of Sordoni's duties under the building code could be addressed, if necessary, by the trial court on remand; and (4) the trial court was convinced that its prior reasoning had been incorrect.

[12] The claims alleged liability under the building code and loss of consortium on the part of Reine Pelletier.

needed to determine whether the plaintiff had been negligent and, if so, whether his negligence was more than 50 percent responsible for his injuries. On May 24, 2005, Sordoni filed a special defense asserting that any injuries, damages and losses suffered by the plaintiff were directly and proximately caused by his own negligence.

The case was tried to a jury in November and December of 2005. On November 29, 2005, Sordoni moved for a directed verdict and asked the court to reconsider its prior rulings on Sordoni's duty to inspect the welds. The trial court denied the motion. In its preliminary request to charge, Sordoni also sought instructions that a violation of the building code constituted evidence of negligence, rather than negligence per se, and that the jury could consider whether Sordoni's alleged negligence was excusable under the circumstances. Having previously decided as a matter of law that Sordoni had a duty to inspect the welds, the trial court declined to instruct as Sordoni requested. The court also declined to give instructions proposed by the plaintiff regarding common-law negligence.[13] On December 8, 2005, the jury returned a verdict in favor of the plaintiff and awarded him $5,645,834.74 in economic damages, $22,710,000 in noneconomic damages and awarded

---

[13] In its preliminary request to charge dated October 28, 2005, the plaintiff sought instructions that, in determining whether Sordoni had been negligent, the jury should consider the "specifications of negligence" set forth in paragraph 8, subparagraphs (a) through (m), of the plaintiff's third amended complaint. See footnote 6 of this opinion.

The plaintiff also sought two additional instructions that the jury should consider whether Sordoni was liable to the plaintiff for negligence under the rule that an employer of an independent contractor has a duty to ensure that an independent contractor takes special precautions when the work to be performed by the independent contractor involves a peculiar unreasonable risk of harm and the rule that an employer has a duty to exercise reasonable care with respect to any part of the work the employer entrusts to an independent contractor over which the employer retains control.

Reine Pelletier $3,800,000 for loss of consortium, for a total damages award of $32,155,834.74.

On January 9, 2006, Sordoni filed a motion for judgment notwithstanding the verdict, claiming that it did not owe the plaintiff a separate, distinct, nondelegable duty to conduct special inspections of all steel welds at the Pitney Bowes site. In the alternative, Sordoni claimed that the trial court should set aside the verdict and order a new trial because the court improperly had: (1) concluded that a violation of the building code constitutes negligence per se; (2) denied Sordoni's request to charge the jury on excusable negligence; (3) concluded that a single statement made by Sordoni's counsel during oral argument on the plaintiff's motion for summary judgment constituted a judicial admission; and (4) ordered that one of the plaintiff's requests to admit be deemed granted. Sordoni also challenged the verdict as excessive. The trial court denied the motion. The court further denied Sordoni's motion for remittitur seeking to reduce the award of damages. On March 9, 2006, the court rendered judgment for the plaintiff on the jury verdict, granted his motion for postjudgment interest and attorney's fees and awarded him damages in the amount of $41,417,065.15. This appeal and cross appeal followed.

I

Sordoni first claims that the trial court improperly concluded that it owed the plaintiff a nondelegable duty of care under § 1307 of the building code to inspect all welds at the Pitney Bowes site and that its failure to do so constituted negligence per se.[14] Sordoni specifically claims that neither the building code itself, nor any provisions incorporated therein, created such a duty,

---

[14] We understand Sordoni's reference to all steel welds "at the Pitney Bowes site" to mean all steel welds fabricated by Berlin Steel, whether in its shop or on the site.

and that this conclusion is supported by out-of-state case law and public policy, which militate against placing legal responsibility for compliance with the building code's numerous technical requirements on general contractors. The plaintiff responds that the building code imposed a nondelegable duty on Sordoni, as the permit applicant, to provide special inspections of all steel welds. We agree with Sordoni that it did not have a nondelegable duty under the building code to inspect all welds.

## A

Before we address the merits of the claim, we first consider whether it was properly preserved for appellate review. The plaintiff contends that Sordoni's challenge to the trial court's denial of its pretrial motion for summary judgment is improper because a party cannot appeal from the denial of summary judgment following a trial on the merits. An appeal instead must be taken from the jury's verdict and the court's final judgment rendered thereon. Thus, according to the plaintiff, the only relevant issue on appeal is whether the trial court correctly charged the jury regarding Sordoni's duty to the plaintiff. Sordoni replies that it properly preserved the issue of its duty to the plaintiff under the building code by asserting the claim in its pretrial motion for summary judgment and then reasserting the claim in its motion for directed verdict at the close of the plaintiff's case and, thereafter, in its posttrial motion for judgment notwithstanding the verdict or to set aside the verdict. We conclude that Sordoni's claim is appealable.

It is well established that, "absent exceptional circumstances, a denial of a motion for summary judgment is not appealable where a full trial on the merits produces a verdict against the moving party. . . . The basis of this policy is that even if the motion is improp-

erly denied, the error is not reversible; the result has merged into the subsequent decision on the merits. To hold otherwise would be to depart from this sound policy which allows a decision based on more evidence to preclude review of a decision made on less evidence." (Citation omitted; internal quotation marks omitted.) *Gurliacci* v. *Mayer*, 218 Conn. 531, 541 n.7, 590 A.2d 914 (1991).

We conclude that exceptional circumstances exist in the present case that permit this court to review Sordoni's claim. The issue of whether Sordoni had a duty under the building code to inspect all welds was decided by the trial court as a matter of law prior to the start of the trial. The court subsequently instructed the jury that "an applicant for a building permit has the duty to conduct an inspection of all welds for the steel elements of buildings and structures to ascertain that all fabrication and erection by welding is performed in accordance with the requirements of the contract documents and to make certain that . . . all welds conform to the requirements of the structural welding code and to the detail drawings." The court added that the jury must decide, not whether a legal duty existed, but whether the building code had been violated by Sordoni's acts or failure to act. The court explained: "The only claim being made here is that [Sordoni] negligently failed to inspect the weld when it had an administrative duty or legal duty to do so." Thus, because the issue of Sordoni's legal duty was decided in the pretrial hearing and no further evidence on the question was presented at trial, the underlying policy that a decision based on more evidence following a full trial on the merits should preclude review of a decision made on less evidence is not violated by allowing appellate review of Sordoni's claim that it did not have a duty under the building code to inspect all welds.

Moreover, Sordoni preserved its claim, following the trial court's denial of its motion for summary judgment, not only in its oral motion for directed verdict, but also in its subsequent motion for judgment notwithstanding the verdict and/or to set aside the verdict and for a new trial,[15] which the trial court denied. See *Doe* v. *Yale University*, 252 Conn. 641, 661 n.19, 748 A.2d 834 (2000) (claim adequately preserved by defendant's objections in its motion for summary judgment, its motion for directed verdict that incorporated its objections and its motion to set aside verdict). We therefore conclude that Sordoni's claim may be reviewed on appeal.

B

Turning to the merits, we begin by noting that "[t]he existence of a duty of care is an essential element of negligence. . . . A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." (Internal quotation marks omitted.) *Ward* v. *Greene*, 267 Conn. 539, 547, 839 A.2d 1259 (2004). The existence of a legal duty is a question of law over which we exercise plenary review. *David M. Somers & Associates, P.C.* v. *Busch*, 283 Conn. 396, 407, 927 A.2d 832 (2007) ("[w]hen a trial court's legal conclusions are challenged . . . our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record" [internal quotation marks omit-

---

[15] In its motion, Sordoni requested that the court set aside the jury's verdict and render judgment in its favor "because it did not owe the plaintiff a separate, distinct and nondelegable duty to conduct special inspections of the steel welds at the Pitney Bowes site. In the alternative, this [c]ourt should set aside the jury's verdict and order a new trial because . . . the [c]ourt improperly concluded that a violation of the BOCA [c]ode constitutes negligence per se . . . ."

ted]); *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 571, 717 A.2d 215 (1998).

In the present case, the plaintiff alleges that the duty arises under the building code. General Statutes § 29-252 provides in relevant part that the state shall adopt and administer a building code "based on a nationally recognized model building code for the purpose of regulating the design, construction and use of buildings or structures . . . ." The provisions of the building code at issue are contained in the 1988 supplement to the BOCA[16] National Building Code of 1987 (building code § 1307 et seq.) and the standards articulated in the Structural Welding Code—Steel of the American Welding Society, Inc., (AWS) D1.1 (welding code),[17] incorporated therein, which were adopted in 1989 by § 29-252-1a of the Regulations of Connecticut State Agencies. *Pelletier* v. *Sordani/Skanska Construction Co.*, supra, 264 Conn. 534–35.

Section 1307.1 of the building code requires a permit applicant to "provide" special inspections of steel fabricated items as a condition for permit issuance.[18] The applicant must submit a "statement of special inspections" describing the materials and work that require special inspections, the inspections to be performed and a list of the individuals, agencies or firms to be retained for conducting the inspections.[19] Special

---

[16] BOCA is a national building code that is issued by the Building Officials and Code Administrators International, Inc. See footnote 4 of this opinion.

[17] AWS D1.1 is issued by the American Welding Society, Inc., and establishes standards related to welding.

[18] Under § 1307.1 of the building code, "[t]he permit applicant shall provide special inspections where application is made for construction as described in this section. The special inspectors shall be provided by the owner and shall be qualified and approved for the inspection of the work described herein."

[19] Section 1307.1.1 of the building code provides: "Building permit requirement: The permit applicant shall submit a statement of special inspections as a condition for permit issuance. This statement shall include a complete list of materials and work requiring special inspection by this section, the

inspectors must keep records of the inspections, submit interim reports on their status and file a final report documenting their completion. Building code § 1307.1.2.

The special inspections to which the building code refers include inspections of the structural loadbearing members and assemblies constructed on the premises of the fabricator's shop.[20] Welds are among the items that may be fabricated on the premises.[21] Special inspections are not necessary, however, "when the fabricator maintains an agreement with an approved independent inspection or quality control agency to periodically conduct in-plant inspections at the fabricator's plant, at a frequency that will assure the fabricator's conformance to the requirements of the inspection agency's approved quality control program." Building code § 1307.2.2.

Insofar as special inspections of welds are required, the building code mandates that inspections be conducted in conformance with § 6 of the welding code.[22] The welding code describes two types of inspections, fabrication/erection inspections and verification inspections, the former being the responsibility of the

inspections to be performed and a list of the individuals, agencies and/or firms intended to be retained for conducting such inspections."

[20] Section 1307.2 of the building code provides in relevant part: "Inspection of fabricators: Where fabrication of structural loadbearing members and assemblies is being performed on the premises of a fabricator's shop, special inspection of the fabricated items . . . shall be required. The fabricated items shall be inspected as required by this section and as required elsewhere in this code."

[21] Section 1307.3.1 of the building code provides: "Inspection of steel fabricators: The permit applicant shall provide special inspection of steel fabricated items in accordance with the provisions of Section 1307.2." Section 1307.3.3 of the building code provides that "[s]pecial inspections are required for bolts, welding and details as specified in Sections 1307.3.3.1 through 1307.3.3.3."

[22] Section 1307.3.3.2 of the building code provides in relevant part that "[w]eld inspection shall be in conformance with Section 6 of AWS D1.1 . . . ."

contractor[23] and the latter the prerogative of the owner.[24] The welding code further mandates that fabrication by welding must be performed in accordance with the requirements of the contract documents and that the contractor is responsible for conducting visual inspections of all welds.[25]

Sordoni claims that the trial court improperly determined that it had a nondelegable duty under the building

[23] We construe the term "contractor" as referring to the fabricator. This is apparent not only from the manner in which the terms "fabricator" and "inspector" are used within the provision itself, but from other language in the welding code that requires the "contractor" to "correct deficiencies in materials and workmanship as provided in the contract documents"; see § 6.6.2 of the welding code; and "remove and replace" base metal damaged by faulty welding; see § 6.6.3 of the welding code; tasks that only the fabricator would have the skills and contractual authority to perform. Our construction is also consistent with the exception to § 1307.2.2 of the building code, which provides that "[s]pecial inspections of fabricators . . . shall not be required when the fabricator maintains an agreement with an approved, independent inspection or quality control agency . . . ." Thus, if a fabricator satisfies its obligation to inspect all welds by assigning the task to qualified in-house inspectors rather than hiring an independent inspection agency, the permit applicant is required to conduct special inspections under § 1307.2 of the building code.

[24] Section 6.1.1 of the welding code provides in relevant part that "fabrication/erection inspection and testing and verification inspection and testing are separate functions. Fabrication/erection inspection and tests shall be performed as necessary prior to assembly, during assembly, during welding, and after welding to ensure that materials and workmanship meet the requirements of the contract documents. Verification inspection and tests shall be performed in a timely manner to avoid delays in the work.

"Fabrication/erection inspection and testing are the responsibilities of the contractor unless otherwise provided in the contract documents. Verification inspection and testing are the prerogatives of the owner who may perform this function or, when provided in the contract, waive independent verification, or stipulate that both inspection and verification shall be performed by the contractor."

[25] Section § 6.1.4 of the welding code provides: "The [i]nspector shall ascertain that all fabrication and erection by welding is performed in accordance with the requirements of the contract documents." Section 6.6.1 of the welding code provides that "[t]he contractor shall be responsible for visual inspection and necessary correction of all deficiencies in materials and workmanship in accordance with the requirements of Section 3 and subsections 8.15.1, 9.25.1, or 10.17.1 as applicable." Section 8.15.1 of the

code to conduct special inspections of all welds and that a violation of that duty constituted negligence per se. We agree. Assuming, without deciding, that the building code imposes a duty on the permit applicant, we conclude that the applicant does not have a nondelegable duty to inspect all welds, but, rather, a duty to "provide" such inspections, and, in furtherance of this duty, must submit to the state a complete list of materials and work requiring special inspections, the inspections to be performed and the individuals, agencies or firms to be retained for conducting the inspections. We also conclude, in accordance with § 1307.2 of the building code, that the permit applicant does not have a duty to inspect welds fabricated on the premises of the fabricator's shop when the fabricator maintains an agreement with an approved independent inspection or quality control agency to conduct periodic in-shop inspections.

In support of these conclusions we initially note that the building code mandates special inspections of *all* welds because §§ 1307.1, 1307.2 and 1307.3.3.2 incorporate by reference provisions of the welding code that require such inspections. See welding code § 6.1.4 ("[i]nspector shall ascertain that *all* fabrication and erection by welding is performed in accordance with the requirements of the contract documents" [emphasis added]); § 6.6.1 ("contractor shall be responsible for visual inspection and necessary correction of *all* deficiencies in materials and workmanship in accordance with . . . subsections 8.15.1 . . . ." [emphasis added]); and § 8.15.1 ("[*a*]*ll* welds shall be visually inspected" [emphasis added]). Permit applicants, however, are not required to conduct the inspections. Section 1307.1 of the building code merely requires that the permit applicant "*provide*" special inspections.

welding code provides in relevant part that "[a]ll welds shall be visually inspected . . . ."

(Emphasis added.) That the building code does not expect the permit applicant to conduct special inspections is clear from the language of § 1307.1.1, which provides, as a condition for permit issuance, that the applicant shall submit a "statement of special inspections" that includes "a list of the individuals, agencies and/or firms intended to be retained for conducting such inspections." Thus, although the building code does not explicitly *preclude* the permit applicant from conducting special inspections, it clearly contemplates that such inspections will be conducted by a qualified expert retained by the permit applicant or by an approved independent inspection or quality control agency with which the fabricator maintains an agreement.

In the present case, we conclude that Sordoni did not have a duty under the building code to provide special inspections because it subcontracted the work of inspecting all welds to the fabricator, Berlin Steel. The subcontract specifically directed Berlin Steel to provide "all [s]tructural [s]teel and [m]etal [d]eck and related work required" for the project. This work was to be performed "in strict compliance" with the drawings and specifications listed in schedule A. Among the items in schedule A was drawing number S-9, entitled "Steel Details and Notes." Note 13 provided that "[a]ll connections shall be in accordance with [American Institute of Steel Construction, Inc.] AISC specifications." Note 21 additionally provided that "[a]ll structural welding shall conform to AWS and AISC specifications. . . . Provision shall be made for all shop and field inspections and testing of *all welds*. (See specifications.)" (Emphasis added.) These provisions unequivocally establish that Berlin Steel was required under the terms of its subcontract with Sordoni to inspect all welds.

With respect to the manner of conducting the inspections, § 1.3 of the subcontract provided that the work to be performed included all work described in the structural steel specifications. Section 2.4 C of the steel specifications stated that Berlin Steel was "fully responsible for inspection and testing herein required either by utilization of [o]wner's [i]nspection [a]gency reports, or providing [its] own [i]nspection and [t]esting [a]gency." Section 2.4 B of the specifications also directed that if Berlin Steel wanted to use the inspection and testing reports produced by the owner's independent inspection and testing agency, it could do so at its own "responsibility."[26] In the alternative, it could engage its own inspection and testing agency to perform the tests and inspections required under the specifications.

Sections 14.1 and 14.2 of the subcontract further required that Berlin Steel "comply with all [f]ederal, [s]tate, [c]ounty and [m]unicipal laws, ordinances, rules, regulations, orders, notices and requirements" and that, "[w]here the [c]ontract [d]ocuments or any part thereof, conflict with law, codes, ordinances, rules, regulations, order[s], notices or requirements (collectively [l]aws), it is intended that [l]aws be followed." With respect to inspection and testing specifically, § 10.3 of the subcontract stipulated that, "[w]hen the [c]ontract [d]ocuments require the [s]ubcontractor to use an independent testing agency the [s]ubcontractor shall submit the professional credentials of said agency to [Sordoni] for approval, at least twenty days in advance of when the inspection and/or testing is required."

In sum, the subcontract provisions required Berlin Steel, as the fabricator, to inspect all welds in accor-

---

[26] The steel specifications required the owner to conduct random shop and field inspections of the welds.

dance with the building and welding codes. The subcontract expressly contemplated that Berlin Steel would hire an independent testing and inspection agency to perform the inspections because the only way it could satisfy its contractual obligation to inspect all welds as required under the codes was by retaining an agency for that purpose. Accordingly, we conclude that Sordoni had no legal duty to provide special inspections because Berlin Steel was required under its subcontract to inspect all welds in accordance with the building and welding codes.[27]

The plaintiff contends that in *Burns* v. *Board of Education*, 228 Conn. 640, 641–42, 638 A.2d 1 (1994), this court rejected the argument that a defendant could delegate his inspection duties to an agent and then wash his hands of any further responsibility. In *Burns*, the principal issue was whether a student could bring an action for the negligent maintenance of public school grounds during school hours because he was one of a foreseeable class of victims and, thus, qualified for an exception to the doctrine of governmental immunity. The named plaintiff, who slipped on an icy patch in a high school courtyard, brought a complaint against the

---

[27] Sordoni's subcontract with Professional Services, which required the testing company to "provide all [t]esting, [i]nspections, [s]pecial [i]nspections and related work" necessary for the project, also incorporated drawing number S-9 and the structural steel specifications. Sordoni admitted, however, in its response to the plaintiff's January 19, 2005 written request for admission of facts, that it initially had hired Testwell Craig Laboratories of Connecticut (Testwell Craig), and subsequently Professional Services, for the limited purpose of conducting verification inspections of the structural steel at Berlin Steel's fabrication facility. Consistent with this admission, defense counsel declared at the June 23, 2004 hearing on Sordoni's initial motion for summary judgment, the May 2, 2005 hearing on the plaintiff's motion for summary judgment and the October 31, 2005 hearing on the plaintiff's motion in limine, that Professional Services had been retained to conduct special inspections of random welds for verification purposes only and that Berlin Steel was responsible for fabrication inspections of all shop welds to ensure quality control.

city, the board of education and the school superintendent, who claimed that he was not on the premises at the time and had delegated his duties to maintain and care for the high school grounds to the head custodian. Id., 642–43. The trial court granted the defendants' motion for partial summary judgment on the negligence counts and rendered judgment thereon, and the plaintiffs appealed. We observed on appeal that, under the relevant statutory and constitutional provisions, the supervisory responsibilities of the superintendent of schools are not automatically abrogated by the designation of a head custodian to undertake immediate responsibility for maintaining school grounds on any particular day.[28] Id., 648. Rather, "the superintendent of schools bears the responsibility for failing to act to prevent the risk of imminent harm to school children as an identifiable class of beneficiaries of his statutory duty of care." Id., 649. Accordingly, the superintendent could not avoid liability by delegating his supervisory responsibilities to an employee under his control. The governing statutory and regulatory provisions in the present case, however, are completely different from those in *Burns* because they *expressly anticipate* that the permit applicant will retain qualified experts to conduct special inspections of all steel welds, except when the fabricator maintains an agreement with an indepen-

---

[28] Among the statutory provisions we cited that described the responsibilities of the superintendent and formed the basis for his duty were General Statutes §§ 10-220 ("[e]ach local or regional board of education shall maintain good public elementary and secondary schools . . . shall have the care, maintenance and operation of buildings, lands, apparatus and other property used for school purposes . . . and shall perform all acts required of it by the town or necessary to carry into effect the powers and duties imposed by law") and 10-157 ("[a]ny local or regional board of education shall provide for the supervision of the schools under its control by a superintendent who shall serve as the *chief executive officer of the board*. The superintendent shall have executive authority over the school system and the *responsibility for its supervision*" [emphasis added]).

dent inspection agency to conduct the inspections. We therefore conclude that *Burns* is inapposite.[29]

## II

The plaintiff argues, as an alternate ground for affirmance under Practice Book § 63-4 (a) (1),[30] that several other statutes compelled Sordoni, as the permit applicant and general contractor, to provide special inspections throughout construction of the project and to confirm after construction that the inspections were performed. The enumerated statutes impose penalties for violations of the building code; General Statutes § 29-254a;[31] require review of building plans to determine compliance with the building code; General Statutes § 29-263;[32] mandate independent review of plans and specifications to ensure compliance with the building code when construction exceeds certain threshold

---

[29] As a result of our conclusion that Sordoni fulfilled its obligation to "provide" special inspections of all welds by subcontracting the testing and inspecting function to Berlin Steel, we need not reach Sordoni's claims that the trial court improperly: (1) held that Sordoni's conduct contravened the requirements of the building code and constituted negligence per se; and (2) declined to adopt Sordoni's instructions regarding excusable negligence, which rest on the presumption of negligence per se.

[30] Practice Book § 63-4 (a) (1) provides in relevant part: "If any appellee wishes to . . . present for review alternate grounds upon which the judgment may be affirmed . . . that appellee shall file a preliminary statement of issues within twenty days from the filing of the appellant's preliminary statement of the issues."

[31] General Statutes § 29-254a provides: "Any person who violates any provision of the State Building Code shall be fined not less than two hundred nor more than one thousand dollars or imprisoned not more than six months or both."

[32] General Statutes § 29-263 provides in relevant part: "(a) . . . [N]o building or structure shall be constructed or altered until an application has been filed with the building official and a permit issued. . . . Prior to the issuance of a permit . . . the building official shall review the plans of buildings or structures to be constructed or altered . . . to determine their compliance with the requirements of the State Building Code . . . . Such plans submitted for review shall be in substantial compliance with the provisions of the State Building Code . . . ."

limits; General Statutes § 29-276b;[33] and require a certificate of occupancy stating that the structure or work performed substantially conforms to the building code. General Statutes § 29-265.[34] We disagree that Sordoni was required to provide special inspections pursuant to the foregoing statutes.[35]

We conclude that the statutes in question merely require that the plans and specifications for proposed and completed structures substantially conform to the building code and impose no specific duty on the permit applicant, the contractor or on any other party to inspect all welds. The plaintiff's claim is therefore unpersuasive.

[33] General Statutes § 29-276b provides in relevant part: "(c) If a proposed structure or addition will exceed the threshold limit as provided in this section, the building official of the municipality in which the structure or addition will be located shall require that an independent structural engineering consultant review the structural plans and specifications of the structure or addition to be constructed to determine their compliance with the requirements of the State Building Code to the extent necessary to assure the stability and integrity of the primary structural support systems of such structure or addition. . . ."

[34] General Statutes § 29-265 provides in relevant part: "(a) . . . [N]o building or structure erected or altered . . . shall be occupied or used, in whole or in part, until a certificate of occupancy . . . has been issued by the building official, certifying that such building, structure or work performed pursuant to the building permit substantially conforms to the provisions of the State Building Code and the regulations lawfully adopted under said code. . . ."

[35] We note that the only statutes that the plaintiff cited in support of the alternate grounds for affirmance identified in his April 14, 2006 preliminary statement of issues were General Statutes §§ 29-252, 29-276b and 29-276c. Thereafter, the plaintiff cited §§ 29-254a, 29-263, 29-265 and 29-276b in addressing the alternate grounds for affirmance in his appellate brief. We review the plaintiff's claim with respect to all of the statutes cited in the plaintiff's appellate brief, including those that the plaintiff did not cite in the preliminary statement of issues, because they are similar in kind and Sordoni would not be prejudiced thereby. See, e.g., State v. Cruz, 269 Conn. 97, 99 n.2, 107, 848 A.2d 445 (2004) ("we have refused to consider an issue not contained in a preliminary statement of issues only in cases in which the opposing party would be prejudiced by consideration of the issue" [internal quotation marks omitted]).

## III

We next address the plaintiff's claims on cross appeal that the jury instructions were improper.[36] The plaintiff asserts that the trial court should have instructed the jury regarding Sordoni's duty to inspect under principles of common-law negligence. He also claims that the court should have instructed the jury to consider Sordoni's duty (1) to ensure that its independent subcontractor took special precautions to avoid unreasonable risk of physical harm and (2) to exercise reasonable care with respect to those parts of the work site and inspection process over which it retained control. Sordoni responds that the trial court properly concluded that it did not owe the plaintiff a common-law duty of care because the specific harm suffered by the plaintiff was not foreseeable. Sordoni also contends that the rule regarding special precautions does not apply in the present circumstances and that it exercised no control over the instrumentality that caused the plaintiff harm. We conclude that the trial court properly declined to instruct the jury as requested by the plaintiff.

The following additional facts are necessary to our resolution of this issue. Prior to the start of the trial,

---

[36] "Although an appellee is generally the prevailing party below, a prevailing party may still be aggrieved so as to have the right to appeal. Failure to cross appeal may result in a waiver of the right to raise subsequently issues upon which the prevailing party is aggrieved." C. Tait & E. Prescott, Connecticut Appellate Practice and Procedure (3d Ed. 2000) § 4.4. "If a losing party appeals, the prevailing party may then assert as error rulings or decisions of the trial court which the prevailing party wishes considered on appeal in the event the losing party is awarded a new trial." Id., § 2.12; Practice Book § 63-4 (a) ("[a]t the time the appellant sends a copy of the endorsed appeal form and the docket sheet to the appellate clerk, the appellant shall also send the appellate clerk an original and one copy of the following: (1) A preliminary statement of the issues intended for presentation on appeal. If any appellee wishes to . . . (B) present for review adverse rulings or decisions of the court which should be considered on appeal in the event the appellant is awarded a new trial . . . that appellee shall file a preliminary statement of issues . . . ."

the parties filed preliminary requests to charge. On the issue of negligence, the plaintiff requested that the court instruct the jury to consider all "specifications of negligence" against Sordoni set forth in count one of his complaint. See footnote 6 of this opinion. The plaintiff also sought instructions regarding Sordoni's duty (1) to ensure that special precautions were taken to prevent the plaintiff from being exposed to a peculiar unreasonable risk of harm and (2) to exercise due care with respect to those parts of the work site over which it retained control.

Thereafter, the trial court instructed the jury regarding negligence for failure to comply with the building

code but declined to give instructions on common-law negligence. The plaintiff took exception to the jury charge, and the trial court noted that the instruction issue had been properly preserved for review. Sordoni did not object to the charge as given.

We begin our analysis with the standard of review. When we review a challenged jury instruction, "[t]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Instructions are adequate if they give the jury a clear understanding of the issues and proper guidance in determining those issues." (Internal quotation marks omitted.) *Allison* v. *Manetta*, 284 Conn. 389, 395–96, 933 A.2d 1197 (2007). The court should submit to the jury all "issues as outlined by the pleadings and as reasonably supported by the evidence." (Internal quotation marks omitted.) *Goodmaster* v. *Houser*, 225 Conn. 637, 648, 625 A.2d 1366 (1993); *Faulkner* v. *Reid*, 176 Conn. 280, 281, 407 A.2d 958 (1978); 1 D. Wright & W. Ankerman, Connecticut Jury Instructions (Civil) (4th Ed. 1993) § 2, p. 3.

The legal principles that govern a general contractor's liability for the negligence of its independent subcontractors are well established. As we stated in *Pelletier* v. *Sordoni/Skanska Construction Co.*, supra, 264 Conn. 518, the rule that liability may not attach is subject to several exceptions, including, "[i]f the work contracted for be unlawful, or such as may cause a nuisance, or is intrinsically dangerous, or in its nature is calculated to cause injury to others, or if the contractee negligently employ an incompetent or untrustworthy contractor,

or if he reserve in his contract general control over the contractor or his servants, or over the manner of doing the work, or if he in the progress of the work assume control or interfere with the work, or if he is under a legal duty to see that the work is properly performed, the contractee will be responsible for resultant injury. *Norwalk Gas Light Co.* v. *Norwalk,* 63 Conn. 495, 28 Atl. 32 [1893]; *Lawrence* v. *Shipman,* 39 Conn. 586 [1873]; *Alexander* v. *Sherman's Sons Co.,* [86 Conn. 292, 293, 85 A. 514 (1912)]; *St. Paul Water Co.* v. *Ware,* 83 U.S. (16 Wall.) 566 [21 L. Ed. 485 (1873)]; *Creed* v. *Hartmann,* 29 N.Y. 591 [1864]. So, too, the contractee or proprietor will be liable for injury which results from his own negligence. *Lawrence* v. *Shipman,* [supra, 590]. . . . *Douglass* v. *Peck & Lines Co.,* [ 89 Conn. 622, 627, 95 A. 22 (1915)]." (Internal quotation marks omitted.) *Pelletier* v. *Sordoni/Skanska Construction Co.,* supra, 264 Conn. 518. "[W]e have long held that, in the absence of statutory immunity based on the principal employer doctrine . . . a general contractor may, depending on the circumstances, be held liable to an employee of its subcontractor for its own negligence. See, e.g., *Gigliotti* v. *United Illuminating Co.,* 151 Conn. 114, 193 A.2d 718 (1963); *Greenwald* v. *Wire Corp. of America,* 131 Conn. 465, 40 A.2d 748 (1944); *King* v. *Palmer,* 129 Conn. 636, 30 A.2d 549 (1943); *Bogoratt* v. *Pratt & Whitney Aircraft Co.,* 114 Conn. 126, 157 A. 860 (1932)." With these principles in mind, we address each of the plaintiff's claims in turn.

## A

The plaintiff first asserts that the trial court improperly failed to instruct the jury that it could find Sordoni liable on the ground of common-law negligence for violation of its duty to prevent foreseeable harm. The plaintiff claims that he presented sufficient evidence to support an instruction that his injuries were foreseeable because Sordoni did not provide the required special

inspections and knew before the accident that the welds on column 313 had not been inspected. Thus, according to the plaintiff, it was within the province of the jury to decide whether Sordoni had breached its duty. Sordoni responds that the trial court properly declined to instruct the jury on common-law negligence because the plaintiff's injuries were not foreseeable and Sordoni did not exercise control over the steel beam that caused the plaintiff harm.[37] Sordoni also argues that the plaintiff impermissibly bootstraps his claim of common-law negligence onto his claim of negligence under the building code. We conclude that the trial court properly declined to instruct the jury on common-law negligence.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . Contained within the first element, duty, there are two distinct considerations. . . . First, it is necessary to determine the existence of a duty, and then, if one is found, it is necessary to evaluate the scope of that duty. . . . The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand." (Internal quotation marks omitted.) *Considine* v. *Waterbury*, 279 Conn. 830, 859, 905 A.2d 70 (2006). "If a court determines, as a matter of law, that a defendant owes no duty to a plaintiff, the plaintiff cannot recover in negligence from the defendant." (Internal quotation marks omitted.) *Maffucci* v. *Royal Park Ltd. Partnership*, 243 Conn. 552, 567, 707 A.2d 15 (1998).

"Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative

---

[37] Sordoni correctly notes that the trial court considered and decided this issue in Sordoni's favor in the court's summary judgment ruling of August 6, 2004, although the court subsequently vacated the judgment and denied the motion.

to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual. . . . Although it has been said that no universal test for [duty] ever has been formulated . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised. . . . By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result . . . .

"A simple conclusion that the harm to the plaintiff was foreseeable, however, cannot by itself mandate a determination that a legal duty exists. Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed. . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results." (Citations omitted; internal quotation marks omitted.) *Jaworski* v. *Kiernan*, 241 Conn. 399, 405–406, 696 A.2d 332 (1997).

We conclude, as a matter of law, that Sordoni had no legal duty to the plaintiff under principles of common-law negligence because the plaintiff's injury was not foreseeable. No ordinary person in Sordoni's position, knowing what Sordoni knew or should have

known, could have foreseen that the plaintiff would be harmed because the defective weld had not been inspected. Berlin Steel was required under §§ 1.2 and 1.5 of its subcontract with Sordoni to perform its work in "strict compliance" with the applicable "drawings, specifications, addenda and bulletins. . . ." Notes 13 and 21, respectively, of drawing S-9 required Berlin Steel to ensure that "all connections [would] be in accordance with AISC specifications" and that "all structural welding [would] conform to AWS and AISC specifications." Berlin Steel also was required under its subcontract to retain an independent inspection agency to inspect all welds. Furthermore, Sordoni had retained Professional Services, a qualified expert in testing and inspections, to conduct random inspections of the welds for verification purposes. See footnote 27 of this opinion. Finally, no evidence was presented at trial that Sordoni knew, or had reason to know, that Berlin Steel had fabricated a defective weld, had failed to inspect all welds as required under its subcontract or had failed to notice at any other time prior to erection of column 313 on the Pitney Bowes site that the weld was defective.

We have observed in other circumstances that "[r]easonable care does not require that one must guard against eventualities which, at best, are too remote to be reasonably foreseeable." *Schiavone* v. *Falango*, 149 Conn. 293, 298, 179 A.2d 622 (1962). There was no reason for Sordoni to foresee that Berlin Steel would not fulfill its contractual obligations to inspect all welds. Accordingly, in light of the protections provided by Sordoni's subcontracts with Berlin Steel and Professional Services to fabricate and inspect the welds, we conclude that the physical harm suffered by the plaintiff would not have been foreseeable to an ordinary person in Sordoni's position. Consequently, Sordoni had no legal duty to the plaintiff under principles of common-

law negligence and the trial court properly declined to instruct the jury on that claim.

B

The plaintiff next claims that the trial court improperly refused to instruct the jury that it could find Sordoni liable for failing to ensure that special precautions were taken because the fabrication and inspection of welds involved a peculiar and unreasonable risk of serious physical harm to others. The plaintiff claims that Sordoni was negligent because it knew or should have known that steel fabricated items and welds that have not been thoroughly inspected involve a peculiar unreasonable risk during the erection process that could cause serious injury to workers. The plaintiff specifically contends that Sordoni should have required Professional Services to inspect all welds on the Pitney Bowes site during the erection process. Sordoni replies that, in requiring Berlin Steel to ensure the integrity of the structural steel for the Pitney Bowes project and to inspect all welds, it took the precautions necessary to shield it from liability. Sordoni also argues that construction work is not inherently dangerous and does not pose a peculiar unreasonable risk of physical harm to others that requires special precautions. We conclude that the trial court properly declined to instruct the jury on this claim.

As previously stated, the test for determining the propriety of challenged jury instructions is whether they fairly present the case to the jury. See *Allison* v. *Manetta*, supra, 284 Conn. 395–96. Instructions satisfy this standard when they are adapted to the issues, as outlined by the pleadings, and are reasonably supported by the evidence. Id.; *Goodmaster* v. *Houser*, supra, 225 Conn. 648. In the present case, the trial court correctly declined to give the instruction because a claim of negligence for failure to take special precautions was never

raised in the pleadings or in the parties' summary judgment motions. Although count one of the plaintiff's third amended complaint contained twenty-two allegations of negligence against Sordoni, there was no allegation of negligence for failure to ensure that special precautions would be taken by Berlin Steel or Professional Services. Thus, the issue was never "distinctly raised" by the plaintiff and the trial court never decided whether there was any legal basis for such a claim under the exceptions that extend the liability of a general contractor to the employee of its independent subcontractors. See Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"). The fact that the plaintiff sought the instruction in its preliminary request to charge prior to the start of the trial, and then took exception when the trial court declined to give the instruction, does not excuse this defect.

Nevertheless, even if the plaintiff properly had raised this claim, we conclude that it lacks merit. The plaintiff's request is premised on *Taylor* v. *Conti*, 149 Conn. 174, 178, 177 A.2d 670 (1962), and 2 Restatement (Second), Torts § 413, pp. 384–87 (1965). In *Taylor* v. *Conti*, supra, 178, this court held that, "[w]here a party contracts for work to be done of such a character that, even if the work is duly performed, it would naturally, if not necessarily, expose others to probable injury unless preventive measures are taken by him, he is liable for that injury if, while chargeable with knowledge that the work is of such a character, he negligently fails to take preventive measures." See also *Bonczkiewicz* v. *Merberg Wrecking Corp.*, 148 Conn. 573, 172 A.2d 917 (1961). A similar principle is expressed in 2 Restatement (Second), supra, § 413, pp. 384–85, which provides that "[o]ne who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk

of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused . . . by the absence of such precautions if the employer (a) fails to provide in the contract that the contractor shall take such precautions, or (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions."[38]

In the present case, we conclude as a matter of law that the fabrication and inspection of welds is not the kind of work that, when properly done, naturally would expose others to injury unless special preventive measures were taken. It is only when a weld is not fabricated and inspected properly because the fabricator or inspector failed to take ordinary or routine precautions that others may be exposed to danger, as happened in this case. Our reasoning is consistent with that of other jurisdictions that have rejected claims alleging that construction work is inherently dangerous. See, e.g., *Robinson* v. *Poured Walls of Iowa, Inc.*, 553 N.W.2d 873, 877 (Iowa 1996) (excavation of trench, when done with standard precautions, involves ordinary, rather than "peculiar," risk of harm, even though trench may collapse and result in injury or death if improperly excavated); see also *Rice* v. *Delta Air Lines, Inc.*, 458 S.E.2d 359, 361 (Ga. App. 1995) (work on scaffolding not inherently dangerous, but only as result of contractor's negligence in constructing scaffolding improperly). Accordingly, we conclude that the trial court properly declined to instruct the jury that Sordoni had a duty to ensure that special precautions were taken.

---

[38] Section 416 of 2 Restatement (Second), supra, similarly provides: "One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

## C

The plaintiff finally claims that the trial court improperly refused to instruct the jury that Sordoni had a duty as the general contractor to exercise reasonable care with respect to any part of the work site or inspection process over which it retained control. We disagree.

The premise underlying the general rule that an independent subcontractor is liable for losses resulting from negligence in the performance of its work is that "the assumption and exercise of control over the offending area is deemed to be in the independent contractor." *Darling* v. *Burrone Bros., Inc.*, 162 Conn. 187, 196, 292 A.2d 912 (1972); see also 2 Restatement (Second), supra, § 409, comment b, p. 370 ("since the employer has no power of control over the manner in which the work is to be done by the contractor, it is to be regarded as the contractor's own enterprise, and [the contractor], rather than the employer, is the proper party to be charged with the responsibility of preventing the risk, and bearing and distributing it"). As noted previously, however, an exception to this rule is when the general contractor retains all or partial control over the work to be performed. *Pelletier* v. *Sordoni/Skanska Construction Co.*, supra, 264 Conn. 518. "Where the evidence on the question as to who had control of the area or instrumentality causing the injury is such that the mind of a fair and reasonable [person] could reach but one conclusion as to the identity of the person exercising control, the question is one for the court, but, if honest and reasonable [persons] could fairly reach different conclusions on the question, the issue should properly go to the jury. . . . In addition, the contractor's control need not be exclusive; it is sufficient if it be shared with another." (Citation omitted; internal quotation marks omitted.) *Van Nesse* v. *Tomaszewski*, 265 Conn. 627, 631, 829 A.2d 836 (2003). In the present case, the question is one for the court because a fair

and reasonable person could reach but one conclusion as to who exercised control over the fabrication and inspection of welds.

The plaintiff argues that Sordoni maintained control over all safety measures and programs related to the project, including special inspections, under (1) its contract with Pitney Bowes, (2) the orientation and procedures manual the plaintiff signed stating that Sordoni would conduct weekly inspections of all construction activity and (3) the subcontracts Sordoni entered into with its agents to conduct verification inspections. The plaintiff claims, however, that Sordoni failed to exercise due care in overseeing project safety, thus rendering it liable for the plaintiff's injury.[39] The plaintiff specifically contends that Sordoni failed to ensure that all welds were properly fabricated, failed to inspect the defective weld prior to the accident and knew that its agents had not inspected all of the welds after they were fabricated. Sordoni responds that Berlin Steel was responsible for fabricating and inspecting the welds and that Sordoni did not control or direct the manner in which Berlin Steel performed its work.

The plaintiff relies in part on *Van Nesse* v. *Tomaszewski*, supra, 265 Conn. 628, 629–33, in which the question of whether the general contractor exercised control over the work site was submitted to the jury because the evidence was equivocal. In that case, the plaintiff was injured when he fell off a ladder while employed by a framing subcontractor hired by the general contractor to assist in constructing a house. The ladder was owned by the subcontractor and had a broken foot. Id.,

---

[39] We do not address the claim that Sordoni retained control over the work site on the basis of its contract with Pitney Bowes or the orientation and procedures manual because we rejected a similar claim in *Pelletier* v. *Sordoni/Skanska Construction Co.*, supra, 264 Conn. 530–31, wherein the plaintiff argued that Sordoni owed him a duty of care under its contract with Pitney Bowes and the orientation and procedures manual.

629. For this reason, the ladder ordinarily was used outside the house, where the broken foot could be secured in the soil for safety. Id., 629. On the day that the plaintiff was injured, however, the ladder had been placed through an opening in the first floor of the structure, which had been covered in plywood, and its feet were planted in a large accumulation of sawdust on the concrete floor of the basement. Id. The plaintiff had climbed down the ladder to the basement without incident, but as he was climbing back up, the ladder slid out from under him, causing him to fall and sustain serious injuries. Id., 629–30. The plaintiff commenced an action against the general contractor, who argued that he did not have sufficient control over the work site to render him liable for the plaintiff's injuries. Id., 633. The court submitted the question of the general contractor's control to the jury because, although the ladder was owned by the subcontractor and the general contractor had no employees on the work site when the accident occurred, other evidence suggested that the general contractor maintained control over the area or the instrumentality that had caused the plaintiff harm. Id. This evidence included a provision in the contract between the property owners and the general contractor charging him with responsibility for keeping the property free from rubbish and waste during construction. In addition, the subcontractor's work in the basement had been completed for approximately two weeks, the ladder was the only means of access to the basement and other tradesmen had reason to be in the basement in the days immediately before the accident, thus indicating that the general contractor had not fully relinquished control of the basement area to any particular subcontractor. Id., 632. The general contractor also inspected the premises daily, and there was evidence from which the jury could have inferred that the general contractor, or one of his employees, had swept the

sawdust into the basement, thus causing the footing of the ladder to become unstable. Id.

In the present case, we conclude that the trial court properly declined to submit the question of Sordoni's control over the fabrication and inspection of welds to the jury because the evidence clearly demonstrates that Sordoni did not retain control over the "area or instrumentality" that caused the plaintiff harm. Sordoni subcontracted the fabrication and inspection of the structural steel elements, including all welds, to Berlin Steel. It thus had no control over the shop in which the welds were fabricated or the manner in which the inspections were to be performed, other than to require that the welds be inspected. Berlin Steel fabricated the welds at its own facility, supervised the work to be performed and was responsible under its subcontract with Sordoni for complying with the laws, ordinances, rules, regulations, codes, standards and requirements pertaining to fabrication and inspection of all structural steel for the Pitney Bowes project.

Moreover, although the orientation and procedures manual indicated that Sordoni would conduct weekly inspections to ensure compliance with its safety program, the manual was not a legally binding contract and did not grant Sordoni authority or control over specific construction activities. *Pelletier* v. *Sordoni/ Skanska Construction Co.*, supra, 264 Conn. 532–33. The safety manual was "an informational tool designed to educate the plaintiff in the protocols for the job site . . . . The plaintiff was required to read the manual and verify by signature that he understood its principles prior to his admission onto the work site. The language of the manual . . . [was strictly] informational . . . in nature." Id. Accordingly, a fair and reasonable person could reach but one conclusion as to who exercised control over the welding and inspection process, namely, Berlin Steel. We therefore conclude that the

trial court properly declined to submit the issue of Sordoni's control over the work of Berlin Steel to the jury or to instruct the jury that Sordoni had a duty to use due care on the ground that it continued to exercise control over the fabrication and inspection of welds.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment for the defendant.

In this opinion the other justices concurred.